UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

PROVIDER SYNERGIES, LLC.,
An Ohio Limited Liability Company

      Plaintiff,

      v.                        CIVIL ACTION NO. 2:08-0101

GOOLD HEALTH SYSTEMS, d/b/a
GHS DATA MANAGEMENT,
a Maine Corporation,

      Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, Provider Synergies, LLC ("Provider Synergies"), by its attorneys, Steptoe and Johnson, PLLC and Fox Rothschild LLP, respectfully submits this memorandum of law in support of its motion for a preliminary injunction against defendant, Goold Health Systems d/b/a GHS Data Management ("GHS").

**I.     INTRODUCTION**

Provider Synergies filed this action seeking injunctive and other relief as a result of GHS's knowing and intentional misappropriation of Provider Synergies' trade secret pricing and discount information, as well as GHS' interference with Provider Synergies' current and prospective contractual relations. By this motion, Provider Synergies requests that the Court grant a preliminary injunction: (1) enjoining and restraining GHS, until further order of this Court, from using, disclosing, or in any way disseminating or relying upon, directly or through the Sovereign States Drug Consortium ("SSDC"), Provider Synergies' confidential discount pricing and supplemental rebate information that GHS has knowingly misappropriated; (2)

enjoining GHS from offering and/or allowing the State of West Virginia, Bureau of Medicaid Services or SSDC to use Provider Synergies' confidential discount pricing and supplemental rebates; (3) compelling GHS to immediately return all documents and information containing Provider Synergies' confidential discount pricing and supplemental rebate information; (4) enjoining GHS from soliciting or permitting any additional states to join SSDC for a period of twelve (12) months; and (5) such other relief as this Court deems just and proper.

## II.     FACTUAL BACKGROUND

Provider Synergies is a company engaged in the pharmacy benefits business, including managing preferred drug lists and negotiating supplemental rebates from manufacturers of prescription drugs approved for use as part of a state's Medicaid program.  See Affidavit of Steve Liles, Director of Rebate Contracting (hereinafter "Liles Affidavit," a true and correct copy of which is attached to Plaintiff's Motion for Preliminary Injunction as Exhibit "A"), ¶ 2. Provider Synergies provides these services both on behalf of individual state Medicaid programs and a multi-state Medicaid "purchasing pool" that it manages called the TOP$ pool.  See Complaint, ¶¶ 1-2.  A multi-state "purchasing pool" is an association of various states, approved by the federal government, that is formed to permit the participating states, through the purchasing pool, to negotiate directly with pharmaceutical manufacturers for lower drug costs. See Liles Affidavit, ¶¶ 11-13.  The purchasing pools are managed by companies such as Provider Synergies and GHS who negotiate with the drug manufacturers for lower drug prices on behalf of the purchasing pool.  See Liles Affidavit, ¶¶ 2-3.  These lower drug costs are known as "supplemental rebates" and are in addition to other rebates mandated by the federal government. See Complaint, ¶¶ 12, 13, 21; see also Liles Affidavit, ¶ 9.  In such a multi-state prescription drug purchasing pool, states combine their purchasing power to generate greater negotiated supplemental drug rebates in order to reduce the cost of the states' respective Medicaid

programs.  See Complaint, ¶ 17, see also Liles Affidavit, ¶ 14.  GHS is a direct competitor of Provider Synergies.  See Complaint, ¶¶ 3-4; see also Liles Affidavit, ¶ 4.

There are currently three approved multi-state purchasing pools: 1) The TOP$ pool managed by Provider Synergies; 2) The Sovereign States Drug Consortium ("SSDC") managed by GHS; and 3) National Medicaid Pooling Initiative ("NMPI") managed by a company called First Health Services Corporation, an affiliate of Provider Synergies.  See Complaint, ¶ 21; see also Liles Affidavit ¶ 18.  Drug manufacturers may offer different supplemental rebates based, in part, on factors that are specific and unique to each of the states or pools.  See Complaint, ¶ 22; see also Liles Affidavit, ¶ 19. The supplemental rebate depends on various factors, including volume discounts and usage patterns, as well as the negotiating capabilities of the pharmacy benefits manager that represents a state or supplemental rebate pool.  See Complaint, ¶ 29.  The amount of the supplemental rebate or discount that a given state or pool is able to negotiate through its pharmacy benefits manager with a drug manufacturer as to a particular drug is highly confidential information.  See Complaint, ¶ 23; see also Liles Affidavit, ¶ 20.

On or about July 1, 2005, the State of West Virginia, Bureau of Medicaid Services ("BMS") joined the TOP$ supplemental rebate pool by signing the TOP$ Medicaid Program Participation Agreement, an attachment to the TOP$ State Supplemental Rebate Agreement ("TOP$ SRA").  The TOP$ SRA is an agreement among Participating Medicaid Programs, various drug manufacturers, and Provider Synergies, the manager of the TOP$ pool. (The TOP$ SRA, including all Attachments and Exhibits shall be collectively referred to as the "Agreement").  The term of the Agreement between BMS, the TOP$ pool, and the participating drug manufacturers ran through December 31, 2007.  See Complaint, ¶ 27; see also Liles Affidavit, ¶ 24.  The parties to the TOP$ Agreement, including Provider Synergies, other

3

member states and participating drug manufacturers, consider supplemental rebate pricing negotiated by Provider Synergies on behalf of the TOP$ pool to be highly confidential and trade secret information. See Complaint, ¶¶ 29-30; see also Liles Affidavit, ¶ 22. In fact, as a condition to participating in the TOP$ pool, all states, including West Virginia, agreed to maintain the supplemental rebates negotiated by Provider Synergies with participating drug companies strictly confidential. See Complaint, ¶ 31. A state's ability to benefit from the negotiated supplemental rebates is conditioned upon and directly linked to its membership in the pool. See Complaint, ¶ 31.

In recognition of the importance of maintaining the confidentiality of supplemental rebate information, the TOP$ Agreement provides, in relevant part:

> Any documents or data obtained by Manufacturer from any Participating Medicaid Program in connection with carrying out the services under this Agreement shall be kept confidential and not provided to any third party unless disclosure is approved in writing by an actual agent of the affected Participating Medicaid Program(s). **Each party shall protect the confidentiality of Confidential Information provided by the other party or from a Participating Medicaid Program or from a Participating Medicaid Program contractor, or to which the receiving party obtains access by virtue of its performance under this Agreement, that either has been identified as confidential by the disclosing party or by its nature warrants confidential treatment. The receiving party shall use such Confidential Information only for the purposes of this Agreement and shall not disclose it to anyone except those of its employees, consultants, contractors, agents, and assigns who need to know the information provided that such persons and/or entities are notified of all confidentiality and non-disclosure provisions stated herein and expressly warrant and represent that they shall abide by such.**

TOP$$^{SM}$ State Supplemental Rebate Agreement, § 8.7, Exhibit A to Complaint; Complaint ¶ 31; Liles Affidavit ¶ 28.

4

In early 2007, BMS issued a request for proposals to administer and provide, among other things, the supplemental rebate negotiations and related services then being provided by Provider Synergies, including services through the TOP$ pool. See Complaint, ¶ 35; see also Liles Affidavit, ¶ 31. Although Provider Synergies submitted a response to the RFP, in October, 2007, BMS ultimately selected GHS as the new vendor for their preferred drug list and Medicaid rebate program. See Complaint, ¶ 36; see also Liles Affidavit, ¶ 32. As a result of the change in managers, BMS' participation and membership in the TOP$ pool ended as of December 31, 2007. Thus, BMS' entitlement to the benefit of the TOP$ supplemental rebates also ended on December 31, 2007.

As the new benefits manager for BMS, GHS intends to have BMS join the SSDC supplemental rebate pool that it manages. See Complaint, ¶ 37. However, rather than negotiate with the drug companies individually on behalf of BMS or to have the SSDC Pool supplemental rebates apply to BMS's Medicaid prescription drug program, GHS actively solicited from BMS and BMS provided to GHS all of the hundreds of highly confidential supplemental price rebates that Provider Synergies had negotiated with participating drug manufacturers for the benefit of the TOP$ pool members. See Complaint, ¶ 38; see also Liles Affidavit, ¶ 34. GHS knew this information was highly confidential and knew its acquisition of such information was improper. Among the highly confidential pricing information improperly acquired, GHS obtained: invoices for supplemental rebates from the previous quarter, copies of existing supplemental rebate contracts, a spreadsheet with the various manufacturers and contract timing information, and a spreadsheet of the Guaranteed Net Unit Price that Provider Synergies had negotiated for BMS. See Complaint, ¶ 40; see also Liles Affidavit, ¶ 36. James A. Clair, Chief Executive Officer for GHS, explicitly acknowledged GHS's solicitation and receipt of this confidential and

5

proprietary information in a December 19, 2007 letter to Peggy King, Pharmacy Services Director of the West Virginia Bureau for Medicaid Services, a true and correct copy of which is attached as Exhibit "B" to the Complaint. See Complaint, ¶ 42; see also Liles Affidavit, ¶ 38. However, GHS falsely claimed in its letter that its acquisition of the confidential supplemental rebate information was needed to perform its new contract with BMS. If GHS wished to maintain the TOP$ pricing until it had the opportunity to negotiate its own rates for BMS, GHS simply could have asked the manufacturers to maintain those rates without disclosing what they actually were.

GHS has now admittedly and improperly acquired highly confidential rebate information that will inevitably be disclosed and used to the disadvantage of the TOP$ pool by GHS and SSDC, the purchasing pool GHS manages. Accordingly, Provider Synergies seeks injunctive relief against GHS to protect the integrity of the TOP$ pool and prevent GHS from using this trade secret information for the benefit of BMS and in its management of the SSDC Pool.

### III. ARGUMENT

#### A. The Court Should Grant Provider Synergies' Motion For A Preliminary Injunction To Prevent Further Misuse By GHS Of Provider Synergies' Trade Secret.

A preliminary injunction is issued to protect a movant from irreparable harm and to preserve the court's power to render a meaningful decision after a trial on the merits. Generally, in evaluating a plaintiff's motion for a preliminary injunction, a court must weigh four factors: (1) the likelihood that plaintiff will succeed on the merits; (2) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (3) the likelihood of harm to the defendant if the injunction is granted; and (4) whether granting the injunction will be in the public interest. See East Tenn. Natural Gas Co. v. Sage, 361 F.3d 808, 828 (4th Cir. 2004) (citing Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 193-96 (4th Cir. 1977). The court in

6

Blackwelder described the following "settled principles which govern consideration of a Rule 65(a) motion" in the Fourth Circuit by stating:

> It is sufficient (to grant the motion) if the court is satisfied that there is a probable right and a probable danger, and that the right may be defeated, unless the injunction is issued, and considerable weight is given to the need of protection to the plaintiff as contrasted with the probable injury to the defendant.

Blackwelder, 550 F.2d at 193, citing Sinclair Refining Co. v. Midland Oil Co., 55 F.2d 42 (4th Cir. 1932).

Based on these well established Fourth Circuit principles, Provider Synergies is entitled to a preliminary injunction in this matter.

### 1. Provider Synergies Is Likely To Succeed On The Merits.

Pursuant to the West Virginia Uniform Trade Secrets Act, a "trade secret" means information, including but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that: (1) derives independent economic value, actual or potential, from not being generally know to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. See W.Va. Code. § 47-22-1(d)(1) – (d)(2). Supplemental rebate or pricing information, such as that requested and received by GHS, is recognized to be confidential trade secret information that is worthy of heightened protection. See Pharmaceutical Care Mgmt. Assoc. v. Rowe, 307 F.Supp.2d 164 (D.Me. 2004) (acknowledging that financial and rebate information belonging to pharmacy benefit managers is a highly confidential trade secret). Provider Synergies' supplemental rebate information is a trade secret because Provider Synergies derives independent economic value from this information not being generally known to, or readily ascertainable by proper means by, other parties such as GHS. Further, Provider Synergies has taken reasonable efforts to maintain

7

the secrecy of this information by explicitly describing its expectations for treatment of confidential information in the TOP$ Agreement. See Haught v. Louis Berkman LLC, 417 F.Supp.2d 777, 781 (N.D.W.Va. 2006) (holding that pricing information, customer information, financial information, and related items were trade secrets pursuant to the West Virginia Uniform Trade Secrets Act); see also Liles Affidavit, ¶ 28-29.

Second, Provider Synergies will be able to prove that its trade secret – supplemental rebate information – was "misappropriated" by GHS. In fact, GHS has admitted that it sought and obtained the supplemental rebate information relating to the TOP$ pool. See Liles Affidavit, ¶ 38. Under the West Virginia Trade Secrets Act, "misappropriation" means, in relevant part: (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means. See W.Va. Code, § 47-22-1(b)(1). "Improper means" includes: theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means. See W.Va. Code, § 47-22-1(a). Here, GHS has acquired a trade secret by inducing BMS to breach its duty to maintain secrecy and confidentiality regarding the supplemental rebates. Accordingly, Provider Synergies is likely to succeed on the merits of its claim for misappropriation of trade secrets against GHS.

Further, Provider Synergies is also likely to succeed on the merits of its tortious interference with contractual relations claim. GHS has tortiously interfered with Provider Synergies' contractual relations with the participating drug manufacturers and member states that participate in the TOP$ Agreement and TOP$ pool. To establish prima facie proof of tortious interference under West Virginia law, Provider Synergies must show: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm

8

sustained; and (4) damages.  See Syl. pt. 4, Garrison v. Herbert J. Thomas Memorial Hospital Assoc., 190 W.Va. 214, 438 S.E.2d 6 (1993).  Here, Provider Synergies had and has a contractual and business relationship with BMS, other states, and pharmaceutical manufacturers by virtue of the TOP$ Agreement.  See Liles Affidavit, ¶ 24.  GHS, who competes with this business relationship, intentionally interfered by inducing BMS to breach the TOP$ Agreement and by obtaining, using and relying upon confidential Provider Synergies' information.  See Liles Affidavit, ¶¶ 4, 34, 36-38.  That improper interference in Provider Synergies' contractual relations has caused damage to Provider Synergies.

  GHS knew or should have known that Provider Synergies had a contractual obligation to maintain the secrecy and integrity of the supplemental rebate information.  There is no doubt that GHS considers the supplemental rebate information concerning its SSDC Pool to constitute trade secret information not to be disclosed.  It is also likely that the participation agreements in the SSDC Pool also deem such information confidential and require its manager, GHS, and the participating states to maintain the secrecy of such information.  GHS, without justification, has knowingly and intentionally induced a breach of the Agreement by BMS and improperly obtained information for the stated purpose of  using it to the disadvantage of Provider Synergies.  See Liles Affidavit, ¶¶ 34, 36-37.  Provider Synergies has already received inquiries and complaints from a number of the participating drug manufacturers with whom it has negotiated supplemental rebates on behalf of the TOP$ pool regarding GHS's attempt to obtain the same discounts on behalf of BMS now that it has left the TOP$ pool.  See Complaint, ¶ 58. GHS is also interfering with Provider Synergies' prospective contractual relations to the extent the exclusive supplemental rebates applicable to the TOP$ pool have been disclosed.  New states may be less compelled to join the TOP$ pool with the knowledge that GHS can negotiate the

9

same supplemental rebates based upon the TOP$ supplemental rebates that they inappropriately obtained. Moreover, GHS, will be able to unfairly obtain new members of the SSDC Pool because of its knowledge of and access to the confidential supplemental rebates negotiated by Provider Synergies on behalf of the TOP$ pool. Accordingly, Provider Synergies is also likely to prevail on the merits of its claim for interference with current and prospective contractual relations.

### 2. Provider Synergies Will Be Irreparably Harmed If The Injunction Is Denied.

GHS's acquisition and subsequent use of Provider Synergies' confidential trade secret information represents a harm to Provider Synergies that is irreparable and incapable of being adequately redressed through monetary damages alone. See Haught, 417 F.Supp.2d at 786 (finding that counterclaim defendant would suffer irreparable harm if confidential documents, including pricing information, customer information, and financial information, were disclosed to third parties); see also Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 260 (4th Cir. 1998) (company has an interest in protecting its confidential company documents). Provider Synergies has reason to believe that once GHS obtained this confidential trade secret information regarding supplemental rebates, GHS approached pharmaceutical manufacturers and began making demands for equivalent supplemental rebates on behalf of its member states and its purchasing pool. See Complaint, ¶ 41; see also Liles Affidavit, ¶ 37. Pharmaceutical manufacturers, who negotiate with Provider Synergies with the explicit understanding that those negotiations and the rebate information will be maintained in the strictest confidence, are now approaching Provider Synergies and questioning how and why GHS was able to obtain that information and make such demands. See Complaint, ¶¶ 57-58. These actions by GHS have profoundly injured, and will continue to injure, Provider Synergies'

10

business and reputation.  Provider Synergies will be irreparably harmed if its request for an injunction is denied and GHS is allowed to continue disclosing and relying upon confidential Provider Synergies' information in its own negotiations with pharmaceutical manufacturers and potentially other states.  See Liles Affidavit, ¶ 42.

### 3. GHS Will Not Be Harmed If The Injunction Is Granted.

In contrast to the virtual certainty that Provider Synergies will be harmed if the injunction is not granted, GHS will not be harmed in any way if the injunction is granted.  Preventing GHS from using the confidential trade secret information that it has misappropriated from Provider Synergies merely returns GHS to where it stood prior to the misappropriation and requires GHS to compete on equal footing and without the benefit of wrongly obtained supplemental rebate information.  Granting of the injunction sought by Provider Synergies returns the parties to the status quo that existed preceding the controversy that has been created by GHS's misappropriation.

### 4. Granting This Injunction Is In The Public Interest.

Finally, granting the injunction sought by Provider Synergies is in the public interest.  By combining the collective purchasing power amassed from an association of states in a purchasing pool, pharmacy benefits managers such as Provider Synergies can approach pharmaceutical manufacturers with significantly more leverage than an individual state would possess.  See Complaint, ¶ 17; see also Liles Affidavit, ¶¶ 11-14.  Provider Synergies is thereby able to negotiate greater supplemental rebates on behalf of various states that belong to its pool.  The supplemental rebates inure to the benefit of the states that participate in a purchasing pool and save taxpayers' money otherwise required to fund a state's Medicaid program.  See Complaint; ¶ 17.  Provider Synergies does not retain any portion of the supplemental rebate for itself. GHS's misappropriation and use of Provider Synergies' confidential information impairs Provider

11

Synergies' ability to negotiate for greater supplemental rebates with pharmaceutical manufacturers, who are now concerned and discouraged by the disclosure of their confidential rebate information.

In the midst of a healthcare crisis and skyrocketing prescription drug costs, any opportunity for the poorest of Americans to obtain less expensive prescription drugs is certainly in the public interest.

## IV.    CONCLUSION

For all of the foregoing reasons, Provider Synergies respectfully requests that this Court grant its motion for a preliminary injunction.

**PROVIDER SYNERGIES, LLC.**,
**By Counsel**

s/Kara L. Cunningham_____
Kara L. Cunningham (WVSB #8148)
Kara.Cunningham@steptoe-johnson.com
Russell D. Jessee (WVSB #10020)
Russell.Jessee@steptoe-johnson.com
Steptoe & Johnson PLLC
Chase Tower, Eighth Floor
707 Virginia Street East
P.O. Box 1588
Charleston, WV 25326-1588
(304) 353-8189 (telephone)
(304) 353-8180 (facsimile)

Of Counsel
Ronald J. Shaffer
RShaffer@foxrothschild.com
Beth L. Domenick
BDomenick@foxrothschild.com
Fox Rothschild LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103
(215) 299-2000 (telephone)
(215) 299-2150 (facsimile)
*Counsel for Plaintiff*

PH1 1872874v2 02/12/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**PROVIDER SYNERGIES, LLC.,**
**An Ohio Limited Liability Company**

      **Plaintiff,**

      v.                     **CIVIL ACTION NO. 2:08-0101**

**GOOLD HEALTH SYSTEMS, d/b/a**
**GHS DATA MANAGEMENT,**
**a Maine Corporation,**

      **Defendant.**

## CERTIFICATE OF SERVICE

    I hereby certify that on the 13th day of February, 2008, I caused true copies of the foregoing "MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION" to be served on counsel for defendant GHS Data Management, Inc. via e-mail and overnight mail, addressed as follows:

Christopher E. Howard
Pierce Atwood LLP
*choward@pierceatwood.com*
One Monument Square
Portland, ME 04101,

and on Defendant by hand delivery to the Office of the West Virginia Secretary of State, for forwarding to Defendant's address for notice of process, c/o James A. Clair, CEO, P.O. Box 1090, 45 Commerce Street, Augusta, ME 04332.

                                              s/Kara L. Cunningham
                                              Kara L. Cunningham (WVSB #8148)